OPINION
{¶ 1} A jury found Ismael Rosas (Appellant) guilty of one count of gross sexual imposition and four counts of sexual battery. Mr. Rosas appeals his conviction based on the sufficiency and manifest weight of the evidence as well as various alleged procedural and evidentiary problems. We will affirm. *Page 2 
 {¶ 2} Mr. Rosas and G.V. met in early 2003 and soon began regularly seeing each other socially. She became pregnant with their son in August of that same year. That fall he met G.V.'s two daughters, A.V. and J.P. Mr. Rosas effectively moved in with G.V. and her daughters in late 2003. Their son was born in March 2004 and Mr. Rosas and G.V. were married two months later, in May.
 {¶ 3} G.V. worked the night shift when they met. But in November 2003 she was forced to take maternity leave early because she was experiencing severe hip and back pain. Six weeks after the baby was born, she went back to working the night shift. While she was at work, Mr. Rosas watched the three children and took care of household chores like cooking and cleaning. Eventually, in 2006 G.V. took another job that allowed her to work during the day.
 {¶ 4} A.V. was born on April 5, 1991, making her twelve-years old in early 2004. Sometime in January or February of that year, before the baby was born, G.V., Mr. Rosas, and A.V. were together in G.V.'s bed. While G.V. slept, Mr. Rosas and A.V. were playing around. A.V. testified that he put his hand inside her pants and touched her bottom. This was the first incident of inappropriate sexual behavior. She testified that after her brother was born, Mr. Rosas continued to touch her in similar ways. She said that on another occasion in her mother's bedroom he inserted his finger into her vagina. He did this again, she said, when they were sitting on the living room couch. Another time, he went further. She testified that when she was on the livingroom floor, he inserted his penis into her vagina. The last incident occurred in late 2006. She had asked him to give her a back rub and he agreed. While he was doing so, she fell asleep. When she awoke, her pajama bottoms and underwear were off, or pulled down, *Page 3 
and he was licking her vagina.
 {¶ 5} G.V. testified that in the spring of 2006 she began to notice that A.V. had become withdrawn and almost antisocial. She mostly stayed in her room, and A.V. was crying often. When G.V. would ask her what was wrong, A.V. would burst into tears and say that she did not want to talk about it. After the last incident, A.V. decided to tell someone about what had been going on. She said that she did not do so sooner because her mother was happy with Mr. Rosas and she did not want to ruin that. She also did not think that anyone would believe that he was doing these things to her. Finally, she was afraid. A.V. told her best friend one night on the telephone. The next day at school, the friend persuaded A.V. to talk with a peer mediator, who in turn successfully urged her to talk with a teacher. The teacher contacted A.V.'s mother and the police that day. The police came to the school and brought her to the CARE House, a child advocacy center in Dayton. There, she was interviewed by a detective and a social worker.
 {¶ 6} A.V. was examined by Dr. Lori Vavul-Roediger, a pediatrician at Children's Medical Center in Dayton. The doctor found no abnormalities in A.V.'s genital or anal areas. A.V.'s hymen also appeared normal. Dr. Roediger testified that this does not necessarily mean that A.V. was not sexually abused. After physically examining A.V., Dr. Roediger talked with her. The doctor determined that A.V. was having difficulty sleeping, was not eating, was experiencing anxiety about the abuse and investigative process, and was concerned that her mother did not believe her. A.V. told the doctor that she had cut herself in the past because of the emotional pain that she felt from the abuse. Dr. Roediger diagnosed A.V. with suspected sexual maltreatment, anxiety, *Page 4 
depression, and an eating disorder. She referred A.V. to counseling.
 {¶ 7} A.V. received counseling from Dr. Joy Micelli, a child psychologist at Children's Medical Center. During their sessions, A.V. told Dr. Micelli that she was having flashbacks related to the sexual abuse, intrusive thoughts about the abuse, nightmares, difficulty sleeping, and wanted to avoid thinking or talking about the abuse and anything that reminded her of it. She also said that she was irritable at times, had been gaining weight, had made herself throw-up on occasion, and previously had thoughts of wanting to harm herself. Over the course of three sessions, Dr. Micelli concluded that A.V. was suffering from post-traumatic stress disorder. It was also her conclusion that she had been sexually abused.
 {¶ 8} Mr. Rosas adamantly denies ever sexually abusing A.V. He denies ever touching her in the ways that she alleged. He testified that she was making these allegations because he had caught her doing something very inappropriate, which he told G.V. These allegations, in other words, were her revenge. G.V., however, testified that she knew nothing about A.V.'s inappropriate behavior.
 {¶ 9} He was indicted in November 2006 for gross sexual imposition (victim under thirteen-years old) and five counts of sexual battery. In February 2007 he moved the court to sever the count of gross sexual imposition from the counts of sexual battery. The court overruled his motion. The state filed an amended indictment in June 2007. One of the amendments changed the date that the abuse began from January 1, 2002 to July 1, 2003. The same month Mr. Rosas filed a motion asking the court to order disclosure of A.V.'s grand jury testimony. The court refused.
 {¶ 10} A trial was held in August 2008. Drs. Roediger and Micelli testified for the *Page 5 
state as expert witnesses. After the state's case-in-chief, Mr. Rosas moved for a judgment of acquittal on all counts under Crim. R. 29(A). The court granted the motion with respect to one count of sexual battery, but overruled the motion as to the five remaining counts. Mr. Rosas put on his defense, which consisted of his own testimony and the testimony of an expert, testifying on post-traumatic stress disorder. Following the trial, and after deliberations, the jury returned a guilty verdict on all five counts.
 {¶ 11} Mr. Rosas appealed. He assigns five errors to the trial court's judgment: (1) the evidence is insufficient to support the verdicts, (2) the verdicts are against the manifest weight of the evidence, (3) the trial court should not have permitted Dr. Micelli to testify as an expert, (4) the trial court should have severed the counts, and (5) the trial court should have disclosed A.V.'s grand jury testimony. We will address these errors seriatim.
 {¶ 12} "THE GUILTY VERDICTS AGAINST THE DEFENDANT-APPELLANT WERE NOT SUPPORTED BY THE SUFFICIENCY OF THE EVIDENCE."
 {¶ 13} The question of sufficiency is a question of law. "In essence, sufficiency is a test of adequacy." State v. Thompkins (1997),78 Ohio St.3d 380, 386, 678 N.E.2d 541. Justice Cook explains, "On review for sufficiency, courts are to assess not whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." Id. at 390 (Cook, J., concurring). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, syllabus ¶ 2, *Page 6 574 N.E.2d 492.
 {¶ 14} Mr. Rosas challenges the sufficiency of the evidence supporting each guilty verdict. He was charged under division (A)(4) of the gross sexual imposition statute:
 {¶ 15} "(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
 {¶ 16} "(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person." R.C. 2907.05(A)(4).
 {¶ 17} He was also charged four times under division (A)(3) of the sexual battery statute:
 {¶ 18} "(A) No person shall engage in sexual conduct with another, not the spouse of the offender, when any of the following apply:
 {¶ 19} "(5) The offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person." R.C. 2907.03(A)(5).
 {¶ 20} Mr. Rosas does not say which element of which of the above charged offenses lacks supporting evidence. Rather, he raises only issues related to the quality of the state's evidence. Quality, however, is generally irrelevant in a sufficiency test. Our review of the evidence reveals that the testimony at trial was such that, if believed, a reasonable juror could find Mr. Rosas guilty beyond a reasonable doubt of each offense. *Page 7 
There is no sufficiency problem.
 {¶ 21} The first assignment of error is overruled.
 {¶ 22} "THE GUILTY VERDICTS AGAINST THE DEFENDANT-APPELLANT WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 23} Mr. Rosas contends in his second assignment of error that the jury's verdicts are against the manifest weight of the evidence. Unlike in a sufficiency review, "A court reviewing questions of weight is not required to view the evidence in a light most favorable to the prosecution, but may consider and weigh all of the evidence produced at trial." Thompkins, at 390 (Cook, J., concurring). An appellate court, "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. The issue is one of persuasiveness. Thompkins, at 390 (Cook, J., concurring).
 {¶ 24} Questions of the weight and credibility given to a witness's testimony are left in the hands of the trier of fact. See State v.Bradley (Oct. 24, 1997), Champaign App. No. 97-CA-03, 1997 WL 691510. As we have explained, "[b]ecause the factfinder . . . has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the fact *Page 8 
finder, who has seen and heard the witness." State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288, 1997 WL 476684, at *4. An appellate court is slow to substitute its judgment. Therefore, only if it is clear that the jury reached the wrong conclusion will it reverse.
 {¶ 25} The arguments that Mr. Rosas makes here are identical to those presented under his first assignment of error. While more appropriate here, they are no more convincing. The exonerating evidence in this case is slight. It consists primarily of Mr. Rosas's protestations of innocence, and his expert's testimony on the behavioral characteristics of people who suffer from post-traumatic stress disorder, and his opinion that A.V.'s behavior is inconsistent with such behavior.
 {¶ 26} The evidence supporting the jury's guilty verdicts, on the other hand, consists primarily of A.V.'s testimony plus the testimony of two experts, both of whom opined that A.V. had been sexually abused. A.V.'s mother and sister offered some corroborating testimony. The jury evidently found these witnesses more credible and placed more weight on their testimony than it did on Mr. Rosas and his expert's testimony. A jury does not lose its way simply because it chooses to believe the complaining witness over the defendant. See State v. Finley, Montgomery App. No. 19654, 2004-Ohio-661. After carefully reviewing the record, we cannot say that the jury was wrong to believe A.V. and the state's experts. By doing so, it did not lose its way or create a manifest miscarriage of justice with its verdicts. Therefore, none of the jury's verdicts is against the manifest weight of the evidence.
 {¶ 27} The second assignment of error is overruled. *Page 9 
 {¶ 28} "THE TRIAL COURT ABUSED ITS DISCRETION IN ALLOWING DR. JOY MICELLI TO TESTIFY AS AN EXPERT WITNESS."
 {¶ 29} Mr. Rosas makes three arguments in support of his third assignment of error. First, he argues that expert testimony was not needed in this case. Second, he argues that even if Dr. Micelli is an expert in the field of child sexual abuse, her testimony with respect to this subject is unreliable because there is no agreed-upon standard by which to conclusively determine that a child has been sexually abused. Third, he argues that Dr. Micelli's testimony simply and impermissibly served to bolster the credibility of A.V.'s testimony. For one or all of these reasons, he argues, the trial court abused its discretion by admitting her testimony.
 {¶ 30} The admissibility of expert testimony is governed by evidentiary rule 702. "A witness may testify as an expert if all of the following apply:
 {¶ 31} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 {¶ 32} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 {¶ 33} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. . . ."
 {¶ 34} According to this rule, then, expert testimony must be needed, the proposed expert must be qualified as an expert on the pertinent subject matter, and, even if qualified, the particular testimony must be based on "reliable" information.
 {¶ 35} With respect to the necessity of expert testimony in child sexual abuse *Page 10 
cases, Mr. Rosas does not cite, nor does our own research uncover, any case holding that such testimony does not meet the division (A) requirements of the rule. We agree with the plethora of cases finding that such testimony concerns matters that most jurors know little about.
 {¶ 36} Mr. Rosas argues that Dr. Micelli's testimony is not reliable. A trial court must exercise a "gatekeeping" duty by testing the basis of proffered testimony for reliability. See Kumho Tire Co., Ltd v.Carmichael (1999), 526 U.S. 137, 141, 119 S.Ct. 1167. As division (C) suggests, the issue for the trial court is not whether the testimony is correct but whether the underlying data, methods, and processes are such that they can be trusted to generate reliable information.
 {¶ 37} The criteria that a trial court should use to test reliability depends on the nature of the testimony. In the well-known case ofDaubert v. Merrell Dow Pharmaceuticals, Inc. (1993), 509 U.S. 579,113 S.Ct. 2786, the U.S. Supreme Court developed four factors to help test the reliability of testimony based on scientific information. A few years later, in Kumho Tire Co., Ltd v. Carmichael, the Court revisited the issue and clarified that Daubert's factors, to the extent they are relevant, may also be used to test expert testimony that is based on "technical" and "other specialized" information. The larger principle, taught the Court, is that, regardless of the expert testimony's epistemological basis, when the issue of reliability is raised, the trial court has the duty to determine whether the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." Id. at 149 (citation omitted). Sometimes, said the Court, "the relevant reliability concerns may focus upon personal knowledge or experience" rather than scientific methodology. Id. at 150. *Page 11 
 {¶ 38} The principles in Daubert and Kumho have been incorporated into Ohio law. The Ohio Supreme Court, in Miller v. Bike Athletic Co. (1998),80 Ohio St.3d 607, 687 N.E.2d 735, adopted the four Daubert factors for testing scientific testimony. And in State v. Drummond,111 Ohio St.3d 14, 2006-Ohio-5084, the Court relied on Kumho to hold that testimony on gang-related activities offered by a qualified detective was admissible under Evid. R. 702. The Court decided that in this particular discipline, knowledge and experience, both of which the detective had, were sufficient guarantors of reliability.
 {¶ 39} We too have considered this issue. The expert testimony at issue in State v. Ross, Montgomery App. No. 19036, 2002-Ohio-6084, was from a detective on the visual identification of crack cocaine.Kumho, we observed, clarified the application of Daubert to nonscientific testimony. Therefore, we held that the expert testimony based on "specialized information" was admissible because the threshold test of reliability was met by the detective's extensive practical experience.
 {¶ 40} The question in the instant case is whether Dr. Micelli's testimony meets the threshold test of reliability. The field of psychology, as her testimony indicated, is a complex admixture of science and art. To the extent that they can, psychologists try to apply the principles of scientific methodology. Yet because their object of study is the human mind, science can take them only so far. This is one of those disciplines, which Kumho mentions, that cannot be encompassed entirely by one category of knowledge-scientific," "technical," or "other specialized." There is little doubt that Dr. Micelli possesses extensive formal education and broad, deep experience with sexually abused children. Her testimony here establishes this, and we have previously so found. See *Page 12 State v. Bell, 176 Ohio App.3d 378, 2008-Ohio-2578 (recognizing Dr. Micelli's extensive experience with sexually abused children).
 {¶ 41} After examining the record, we find nothing that would call into question the reliability of her testimony. Her testimony on the behavioral characteristics of sexually-abused children has a reliable basis in the knowledge and experience of the field of psychology, which she has acquired from the classroom and the clinic. Moreover, the Ohio Supreme Court has found that testimony from a psychologist on the behavioral characteristics of sexually abused children is admissible, see State v. Stowers (1998), 81 Ohio St.3d 260, 262, 690 N.E.2d 881, and so have we. See Bell.
 {¶ 42} Mr. Rosas also argues that Dr. Micelli's testimony impermissibly bolstered A.V.'s credibility. This, he argues, improperly invaded the province of the jury, who alone is the judge of credibility. The rules of evidence permit an expert to offer an opinion on an ultimate issue, which the jury was empaneled to decide. Evid. R. 704 ("Testimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact."). As Stowers taught, this includes a psychologist's expert opinion on whether a particular child was sexually abused. Stowers, at 261. What an expert may not do is offer a direct opinion on whether a child is telling the truth. State v. Boston (1989),46 Ohio St.3d 108, syllabus, 545 N.E.2d 1220 (an "expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant"). There is a distinction "between expert testimony that a child witness is telling the truth," on the one hand, and on the other hand, "evidence which bolsters a child's credibility insofar as it supports the prosecution's efforts to prove that a child has been abused." Stowers, at 262. Expert *Page 13 
testimony is admissible as to the latter.[1] This is evidence that provides "additional support for the truth of the facts testifiedto by the child, or which assists the fact finder in assessing the child's veracity." Id. Such testimony "does not usurp the role of the jury, but rather gives information to a jury which helps it make an educated determination." Id. at 263.
 {¶ 43} Here, Dr. Micelli's testimony is within permissible bounds. She testified about the behavioral characteristics of sexually abused children. She then compared these characteristics to A.V.'s behavior and offered her opinion that A.V. had been sexually abused. Dr. Micelli never directly testified that she believed what A.V. had said or that she thought A.V. was a credible witness.
 {¶ 44} The trial court did not abuse its discretion by permitting Dr. Micelli to testify. Mr. Rosas's third assignment of error is overruled.
 {¶ 45} "THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING DEFENDANT'S MOTION TO SEVER THE COUNTS PURSUANT TO CRIMINAL RULE 14."
 {¶ 46} Mr. Rosas argues that he was prejudiced by the trial court's refusal to sever the count of gross sexual imposition from the four counts of sexual battery. He implicitly acknowledges that the two types of offenses were properly joined in the *Page 14 
indictment under Crim. R. 8(A). He argues only that he was prejudiced by the joinder.
 {¶ 47} Ohio's Criminal Procedure Rule 14 requires a trial court to sever properly joined offenses if prejudice exists. The key issue is whether the defendant was prejudiced. See State v. Schaim (1992),65 Ohio St.3d 51, 59, 600 N.E.2d 661. The defendant has the burden to affirmatively show this. State v. Torres (1981), 66 Ohio St.2d 340, 343,421 N.E.2d 1288. Specifically, "he has the burden of furnishing the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial." Id.
 {¶ 48} Mr. Rosas fails to convince us that the trial court abused its discretion. He makes two conclusory assertions that he was prejudiced. First, he argues, the jury may have used the evidence of one of the offenses to infer a general criminal disposition and relied on it, instead of the evidence, to find him guilty of all of the offenses. Second, the jury may have lumped together all of the evidence of all the offenses and used the lump to find him guilty of each individual offense, rather than apply the evidence supporting each individual offense to that offense only. It does not appear from the record, nor does Mr. Rosas claim, that he provided very much information to the trial court about how he was prejudiced. Furthermore, he nowhere says how his rights were prejudiced. He merely asserts broad general allegations of prejudice that any defendant could assert. "The record shows a request by motion for a separate trial but a total failure to show cause. We will not conjecture an abuse of discretion by the trial court." State v. Perod (1968), 15 Ohio App.2d 115, 122, 239 N.E.2d 100.
 {¶ 49} The fourth assignment of error is overruled. *Page 15 
 {¶ 50} "THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING DEFENDANT'S REQUEST TO DISCLOSE GRAND JURY TESTIMONY."
 {¶ 51} Grand jury proceedings are secret. They remain secret unless a trial court exercises the discretion given to it by Criminal Rule 6(E) and orders disclosure. The standard used to decide whether to order disclosure is that of "particularized need." State v. Greer (1981),66 Ohio St.3d 139, syllabus ¶ 2, 420 N.E.2d 982 (A trial court may order release if "the ends of justice require it and there is a showing by the defense that a particularized need for disclosure exists which outweighs the need for secrecy."). Particularized need exists when nondisclosure "will probably deprive the defendant of a fair adjudication of the allegations placed in issue by the witness's trial testimony." State v.Webb (1994), 70 Ohio St.3d 325, 337, 638 N.E.2d 1023. Particularized need being the standard, it almost goes without saying that generalized assertions of need are insufficient. See State v. McGill (Dec. 8, 2000), Greene App. No. 99CA25, 2000 WL 1803650.
 {¶ 52} An appellate court reviews such exercises of discretion only for abuse. Moreover, an appellate court must "reject[] assertions of particularized need when appellants fail[] to meet their burden to specify that need or demonstrate how nondisclosure deprived them of a fair trial." State v. Treesh (2001), 90 Ohio St.3d 460, 477,739 N.E.2d 749.
 {¶ 53} Mr. Rosas contends that his particularized need is evident from the discrepancy in statements attributed to A.V. regarding her age when the alleged abuse began. Her statement that the abuse began in 2002, he says, is reflected in the original *Page 16 
indictment's inception date of January 1, 2002. But, the state later amended the indictment to shorten the relevant time period by changing the inception date to July 1, 2003, which suggests that she was lying. He speculates that there may be other inconsistencies in her story. He does not, however, claim that he was deprived of a fair trial because he did not have A.V.'s grand jury testimony.
 {¶ 54} Mr. Rosas's assertions of possible inconsistencies are too general. The defendant in State v. McGill (Dec. 8, 2000), Greene App. No. 99CA25, 2000 WL 1803650, similarly argued that the trial court should have directed disclosure of grand jury proceedings. After examining the facts of that case, we concluded that "[Plaintiff] had to show that nondisclosure of the grand jury minutes probably deprived him of a fair trial and that the trial court abused its discretion by not disclosing such minutes. He failed to do so, however, as he did not cite any specific basis for a finding of particularized need but instead speculated that the grand jury testimony might have contained improper information from one of the children. It is clear that mere possibility is insufficient to establish a particularized need. Thus, the trial court did not abuse its discretion in overruling [Plaintiffs] motion to review the grand jury transcripts." Id. at *19. The same is true here. Mr. Rosas has not shown how nondisclosure of A.V.'s grand jury testimony deprived him of a fair trial. Furthermore, he failed to establish a particularized need for the grand-jury testimony, saying only that theremight be other discrepancies. His fifth and final assignment of error is overruled.
 {¶ 55} Finding no merit in any assignment of error, we affirm.
FAIN and WOLFF, JJ., concur. *Page 17 
(Hon. William H. Wolff, Jr., retired from the Second Appellate District, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.)
[1] The distinction that the law makes here is very fine. Judge Patton, in his Boston dissent, saw this, and he writes "The distinctions between evidence concerning a typical child abuse victim and a particular child abuse victim are subtle. While experts may testify that it is their opinion that a child has been abused, such opinions implicitly assert a belief in the child's story. Such an opinion, however, is only an indirect comment on truthfulness and is therefore admissible." Boston, at 132 n. 2 (Patton, J., dissenting). Thus, only direct comments on credibility are forbidden. *Page 1