[Cite as *State v. Combs*, 2020-Ohio-4084.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28559 |
| | : | |
| v. | : | Trial Court Case No. 2019-CR-132 |
| | : | |
| PAUL N. COMBS | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 14th day of August, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by LISA M. LIGHT, Atty. Reg. No. 0097348, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

JAY A. ADAMS, Atty. Reg. No. 0072135, 100 North Detroit Street, Xenia, Ohio 45385
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

**{¶ 1}** Paul N. Combs appeals from the trial court's judgment entry convicting him, following a jury trial, on one count of gross sexual imposition (under age 13) ("GSI"), in violation of R.C. 2907.05(A)(4), a felony of the third degree. The trial court sentenced Combs to 24 months in prison and designated him a Tier II sex offender. We affirm the judgment of the trial court.

**{¶ 2}** Combs was indicted on one count of GSI (under age 13) on February 15, 2019, and he pled not guilty. His trial commenced on August 27, 2019. The following evidence was presented at trial.

**{¶ 3}** The victim's mother, "Kristy," testified that she and her husband, "Andrew," live in Kettering with her two daughters, "Sarah" and "Sonia."[1] Kristy testified that Sonia, who is the victim herein, was born in February 2007 and has global disability disorder, including broad spectrum autism, oppositional defiant disorder, and attention deficit hyperactivity disorder (ADHD). Kristy testified that Sonia is high functioning; she can speak and do things for herself, has an individualized education program (IEP), and is on community-based programming at school rather than regular classes.

**{¶ 4}** Kristy and Combs attended high school together. Kristy testified stated that she and her family lived out of state for 15 years and then returned to Kettering, where she and Combs reconnected. Combs lived with his wife, "Jenna", and three daughters near Kristy's home. Kristy stated that on November 2, 2018, she and her family went over to the Combs' family home for a get-together; the adults ordered pizza and were drinking alcohol while the girls were playing throughout the house. Sonia and Combs's

---

[1] We use pseudonyms to refer to the victim, her family members, and some others, to protect the identity of the victim and other minors discussed in this case.

daughter, Emily, are the same age.

{¶ 5} Kristy described Combs's behavior at the get-together as initially upbeat, but she stated that later in the evening he got into an argument with his wife. Kristy testified that Combs was intoxicated over the course of the evening, and that he was "stumbling around, slurring words." She testified that Sarah and two of Combs's daughters decided to spend the night at Kristy's home, and Sonia decided to sleep at the Combs' home with Emily. She testified that the Combs' home was a three-bedroom ranch, and before she went home she observed Sonia in a twin bed with Emily in Emily's room. Kristy testified that the bed was against a wall, and Emily was on the side against the wall. The girls were awake when Kristy saw them in bed, and she said goodnight to them before going home. Kristy testified that Andrew remained with Combs elsewhere in the home while she did so. Kristy testified that, when she left the Combs' home, Combs was "laying in his bed," and the girls "were in their bed."

{¶ 6} Kristy testified that around 3:00 in the morning, after she and Andrew had been home "about 40 minutes or so," Jenna brought Sonia home. Kristy testified that Sonia ran into her arms and began to cry. She testified that Sonia disclosed that Combs had touched her inappropriately, and defense counsel objected. The court overruled the objection, and Kristy testified that Sonia "was just sobbing so much. She said that Paul had touched her and she - - she didn't feel safe there; she came home." Kristy testified that Sonia had not told Jenna what had happened. Kristy stated that she, Andrew, and Jenna spoke privately, and that Jenna said "I don't think he could do this; what was he thinking," and that "she got mad." Kristy and Jenna returned to the Combs' home to confront Combs while Sonia remained with Andrew

{¶ 7} Kristy testified that she and Jenna entered Combs and Jenna's bedroom, and that Jenna slapped Combs to wake him up. Kristy testified that Combs began cussing at Jenna, and that Kristy asked him what happened with him and Sonia. Kristy testified that Combs was "acting like he [didn't] know anything, completely oblivious. He didn't do anything; he didn't touch her." Kristy testified that Combs left the bedroom, went to the kitchen, started throwing things, and was screaming. Kristy testified that she began to walk home, but Jenna picked her up and drove her the rest of the way home, and Jenna pick up her own daughters from Jenna's house. Kristy testified that Sonia had previously been to sleepovers with family and friends and that she had never come home in the middle of the night before.

{¶ 8} On cross-examination, when asked about the symptoms of global disability disorder, Kristy testified that Sonia "gets argumentative" and does not "want to listen." Kristy testified that Sonia "isn't on track with most sixth graders, which is why she's in the program she's in"; Sonia is "slower" in her studies. Kristy stated that Sonia "had times where she was really quiet" when she was growing up, but as she got older, she "just constantly now talks, and even interjects in conversation, just because she wants her opinion to be heard."

{¶ 9} Kristy testified that the night of the abuse was her family's first time at Combs' home. She testified that she called the police and provided a written statement on November 4, 2018, which she identified. In her statement, Kristy recounted that Sonia told her and Andrew that Combs entered Emily's room and "laid between" Emily and Sonia in the bed.

{¶ 10} Andrew testified that Combs was intoxicated on the night of the incident.

According to Andrew, there had been "tension" between Combs and his wife all night about his spending too much time on his phone and talking to other women. Andrew had spent "a fair bit of the night" telling Combs that he was a "clown" he was for doing that. Before leaving the Combs' residence, Andrew testified that he observed Combs "laying on his bed in his shirt and underwear, fondling himself, looking at his phone." He stated that Combs was wearing a red shirt and dark underwear at the time. Andrew testified that prior to leaving, he said goodbye to Sonia, who was sharing a bed with Emily.

{¶ 11} Andrew testified that when Jenna brought Sonia home, he and Kristy were in the living room, and Sonia started crying. When they asked her why she wanted to come home, Sonia told them that "she had woke up and [Combs] was touching her." During questioning by the prosecutor, Andrew stated that he asked Sonia to explain exactly what had happened, and she said, "she woke up and he was next to her." Defense counsel objected to this testimony as hearsay, and the court sustained the objection, saying "I don't think this is an excited utterance anymore." At sidebar, the prosecutor argued that courts have held that "excited utterance and present sense impression has a longer duration for a child, because children take longer to process events." The State also argued that, because defense counsel had inquired of Kristy about statements that Sonia had made to her after the statement made to Andrew, then "the more immediate present sense impression statements to [Andrew] should be allowed." The court pointed out that no objection had been made to Kristy's testimony, and defense counsel withdrew the objection.

{¶ 12} Andrew testified that, after Kristy and Jenna left to confront Combs, Sonia told him that "she had woke up and Paul [Combs] was next to her with his hand on her"

and that he was masturbating; Andrew asked what Combs had been wearing, and Sonia said "a red shirt and dark underwear." When Kristy and Jenna returned to the home, Andrew asked Sonia to tell them what she had told him to "see whether everything still lined up." Andrew testified that Jenna then woke her daughters up and took them home.

{¶ 13} On cross-examination, Andrew testified that he observed Combs on his phone in his bedroom while Kristy and Jenna were in the kitchen talking. He stated, "I went to talk to him some more. When I walked in, that's what he was doing." Regarding the girls' sleeping arrangement, Andrew testified that Sonia "was against the wall, but I don't remember for sure." He stated that the police responded to his home the evening after the incident and took statements from his family, and he identified his statement. Andrew acknowledged that his statement indicated that Sonia told him that Combs was in bed between Sonia and Emily

{¶ 14} On redirect examination, Andrew testified that Sonia had come home in the course of a sleepover before, but that in those cases he and Kristy had picked her up because she "just didn't want to stay the night or wasn't feeling well"; she has never come home crying from a sleepover until she stayed at the Combs' home.

{¶ 15} Sonia, who was in the sixth grade, testified that she met Combs one time at his home. She stated that Kristy brought her pajamas to wear and asked her if she "really wanted to stay here," to which Sonia said yes. Sonia testified that she and Emily fell asleep in the same bed, with Emily next to the wall; Emily fell asleep first, then Sonia heard Combs and Jenna arguing, and her mom "was trying to calm them down." Sonia testified that she later woke up to Combs kneeling next to the bed and touching her "boob" and her "vagina" with his hands over a thin blanket. Sonia stated that Combs was

mumbling, and she could not understand him. She believed he was drunk. Sonia described his touching her as "patting, like back and forth" between her breast and vagina. Sonia testified that Combs "pat more than one time," then he left the room and went to the bathroom. Sonia testified that when he came out of the bathroom, she was "pretty sure" she said something like "get off of me" or "stop it, and stuff." She stated that the first time it happened, she was scared and "didn't know what to say."

{¶ 16} Sonia testified that she had tried to wake Emily but was unable to do so. Sonia testified that, when Combs went into the bathroom again, she went to Jenna and asked her to call Sonia's mom, but Kristy did not answer. Jenna sent Kristy a text, told Sonia to go back to bed, and said she (Jenna) would let Sonia know if Kristy responded. Sonia testified that she did not tell Jenna what Combs had done because she "was too scared to."

{¶ 17} Sonia went back to bed. She testified that she covered herself with the blanket when she got back in bed "just in case he tries." She stated that she believed that Combs "got a beer out of the kitchen, or something like that," and then he came back into her room, kneeling next to the bed. Sonia testified she "was trying to scooch toward [Emily]." She testified that Combs told her to "look," and she told him to go away. Then she "like, screamed at him, and he ran up." When asked if Combs tried to show her something, Sonia responded, "I'm pretty sure his, like, penis," which he was holding with both hands outside of his clothing. Sonia described it as "light pink." Sonia testified that she "ran out of the room and like was crying, trying to get * * * out of the [front] door" to run home, but the door wouldn't open. Jenna heard her "crying and screaming" and asked her if she was okay. Sonia responded, "no, I'm not okay. Paul was touching me."

Sonia stated that she asked Jenna if Jenna was okay to drive, because Sonia was "pretty sure she was drunk also," but Jenna said she was fine and took Sonia home. Sonia testified that she was taken to CARE House after the police were notified.

{¶ 18} On cross-examination, Sonia testified that the first time Combs came into the room and touched her, she quietly told him to "get off of me," and that Emily did not wake up. She stated that Combs then left to "use the bathroom or get a beer." The following exchange occurred between Sonia and defense counsel:

Q. * * * So do you know how many times he came into the room?

A. Four, I think?

Q. Four times?

A. * * * I'm pretty sure the fourth time I, like ran out.

Q. * * * But it might have been the fifth time?

A. Yeah. I can't really remember all that happened since it was a while ago.

Q. * * * So was every time he came in, did the same thing happen?

A. Yeah, he kept on, like touching me.

* * *

A. The first couple times I didn't yell at him because I didn't know what to do; I was nervous. But like, after that, I started to - - like, saying get off of me, and then after all that, I just yelled at him and ran out.

Q. Did that wake up [Emily]?

A. No, I don't - - well, it probably did, but I don't know. I just ran out of the room, crying, so I didn't really see if she was awake. She

probably did wake up, unless she's a heavy sleeper.

Q.  * * * Did Paul ever lay in the bed with you?

* * *

A.  No.

Q.  Did you ever tell anyone that Paul had laid in the bed with you?

A.  I don't think I did.

Q.  Okay.

A.  If I did, then I didn't mean to say it.

* * *

Q.  * * * So sometimes you say things that you don't mean.

A.  Or maybe they just didn't understand me. * * *

* * *

A.  * * *  Or maybe they just thought I said that.

{¶ 19} On redirect-examination, Sonia testified that she was interviewed at CARE House about what happened to her, and that in the course of the interview, she never said that Combs got into the bed with her.   A portion of the interview was played for the jury.   Sonia testified that her version of events in the interview and at trial were the same.

{¶ 20} Dr. Brenda Miceli, a pediatric psychologist at Dayton Children's Hospital, was designated as an expert in child sexual abuse and child psychology.   She testified that she was a psychologist on staff at CARE House, where she provided therapy, psychological evaluations, and individual and family therapy to children who have disclosed abuse or experienced other types of trauma.   She identified CARE House as a partnership between five agencies that provided "a comprehensive approach" to dealing

with children who have disclosed sexual or extreme physical abuse. Miceli testified that she works primarily with children who have experienced sexual abuse, having treated over 2,000 victims.

{¶ 21} Miceli testified that a one-time encounter can qualify as sexual abuse. She stated that, generally, child victims of sexual abuse experience a sense of helplessness, because they have been taught to obey adults and do not know how to respond. She stated that a "second dynamic" is secrecy, because sexual abuse usually does not "take place where other people are going to be able to see it, and so a child feels bound by secrecy oftentimes, which puts a lot of emotional pressure on a child." Miceli testified that disclosure of sexual abuse can be either accidental or purposeful, and that a purposeful disclosure occurs "where a child makes a decision to tell someone."

{¶ 22} According to Miceli, "most children don't disclose immediately" because they are afraid, embarrassed, and fear they will not be believed, will get into trouble, or their abuser will harm them. She stated that the closer an abuser is to a child, the less likely the child is to tell anyone, because "the ramifications of that are so much greater"; if the abuser is new to the child's life, disclosure could be easier. Miceli stated that she had "heard of kids who've * * * reported abuse during sleepovers when other kids are around." Miceli stated that there "are lots of different ways that kids respond, and it depends on kind of their personality. It depends on the situation that's happened. It depends on their coping skills." She stated that she would not be surprised if a child who was abused at a sleepover remained at the sleepover. She testified that children and adults "have three typical stress responses. * * * [I]t's flight, fight, and freeze. * * * And far and away, most kids freeze." According to Miceli, kids often don't know what to do, and

are "sort of [in] a state of shock almost," and that if a child's initial attempt to escape fails, "then they almost always default to sort of what's expected of them."

{¶ 23}  Miceli testified that "[f]ar and away, most children do not lie about sexual abuse," and that "in general, when kids lie, there's a reason," like to get out of trouble. She also observed that, when kids lie about abuse, "over time, we tend to see inconsistencies in their stories.   What they say tends to vary from person to person or from time to time.   And sometimes they don't provide as many details when they're telling something that's not true."   Miceli stated that "over time, children tend to be more likely to disclose more information.   Sometimes * * * they're more comfortable to give more details over time, and depending on the relationship with the person that they're talking to."   She stated that the details of abuse that a child reveals can vary.

{¶ 24} Miceli testified that, at CARE House, the focus is to gather information "in as neutral a way as possible."   She stated that, in the course of interviews, children demonstrate "the full range of demeanors," from being matter-of-fact and calm, to very emotional, embarrassed, or silly, depending on the age and developmental stage of the child.

{¶ 25} On cross-examination, Miceli stated that she had not interviewed any of the witnesses in this case, and that her testimony reflected general patterns and was not specific to Sonia.   Miceli stated that she did not investigate the truthfulness of disclosures in the course of her work.

{¶ 26} Finally, on redirect-examination, Miceli testified:

> Q.  So a child who is sexually abused at a sleepover, would the important part of the story in a child's mind be that he touched my vagina

and he touched my breasts?

A. For most kids, that would be the important part.

Q. Maybe he showed me his penis?

A. That would – things that are outside the norm, outside the usual experience.

Q. Would the important part be how many times he went from the bathroom to the bedroom?

A. Probably not. Kids are not very good with numbers to begin with.

* * *

Q. So a child who is 11 years old, who may not [be] 11 at developmental age, might not be great with numbers?

A. Correct.

* * *

Q. * * * Is there a difference in a story that a child can tell when they have experienced an event as opposed to when that event has been created in their mind?

A. Typically there's an emotional or a sensory component that can be there, if it's something they've experienced where the emotions that they had of feeling afraid or worried or confused or feeling sick. Those can - - that emotional piece or the sensory piece of knowing what something felt like that they wouldn't necessarily have if they haven't experienced that.

{¶ 27} Detective Vincent Mason of the Kettering Police Department was assigned

to Sonia's case on November 5, 2018. He testified that he received statements from Sonia's parents and sister that were taken by the responding officer. Pursuant to policy, the responding officer did not get a statement from Sonia because officers generally "don't talk to a child under 13. We don't want to put * * * a thought in a child's head." Mason testified that children generally are interviewed at CARE House, and he contacted CARE House to set up an interview, which he observed from another room electronically.

{¶ 28} Mason testified that, after the interview, he contacted Combs, and Combs and Jenna came to the police department to be interviewed. Mason testified that Combs was "very cooperative and polite," and he denied Sonia's allegations. According to Mason, Combs said that he was intoxicated on the night of the abuse, and that due to his level of intoxication, he did not remember everything that happened that night. Combs told Mason that "he'd been in the room to tuck his kid in a couple times," that Emily was asleep," and that he may have "fallen over." Mason testified that Combs "said he's pretty sure it did not happen." Mason testified that, according to Combs, Combs was in the bathroom when Sonia "came out" and "threw a fit," after which Jenna took her home.

{¶ 29} Mason testified that he was able to confirm a number of details from Sonia's disclosure, such as who was present on the evening of the abuse, that the adults were drinking alcohol and everyone had pizza, that Sonia was upset and asked to go home, and that she was upset when she got home.

{¶ 30} At the conclusion of the State's case, defense counsel moved for a judgment of acquittal. The court overruled the motion.

{¶ 31} Emily was the only defense witness. When she testified, she was 12 years old and in seventh grade. She stated that on the night of the incident, she, her younger

sister, and Sonia played together until they went to bed. She stated that she and Sonia slept together in a bed against the wall, and that Emily was closest to the wall. Emily stated Combs and Andrew came into the room to say goodnight and to give them a blanket. Emily testified that she had her first gymnastics competition the next day and was trying to go to sleep. She stated that Sonia "went out into the living room or she went and got my mom." Emily was unsure of the details, but she thought Sonia "got scared or something and she wanted to go home and started crying." Sonia did not explain why she wanted to leave, she just said she was leaving.

{¶ 32} Emily testified that Combs did not enter her room after he came in and gave the girls a blanket and told them goodnight. She testified that Jenna and Kristy returned to the home and were yelling at her dad and asking him a bunch of questions because Sonia "said * * * he touched her or something." Emily stated that she just tried to go back to sleep.

{¶ 33} On cross-examination, Emily testified that she and Sonia had slept in their clothes. She stated that after Sonia left her room, Sonia only came back to get her belongings, and that she did not lie down again. Emily testified that she was interviewed at CARE House in March 2019. She stated that when Sonia was in the living room after she left the bedroom, Combs was in the bathroom. Emily testified that her parents told her not to discuss the matter at school or with counselors there. On redirect, Emily testified that her parents told her to be truthful at CARE House and at trial.

{¶ 34} The jury was found Combs guilty of GSI, and the court sentenced him to 24 months in prison. He was also designated a Tier II sex offender.

{¶ 35} Combs asserts three assignments of error. For ease of analysis, we will

consider Combs's second and third assignments of error first and together.

THE TRIAL COURT ERRED IN DENYING THE CRIMINAL RULE 29 MOTION AND THE VERDICT IS NOT SUPPORTED BY THE SUFFICIENCY OF THE EVIDENCE.

THE VERDICT OF THE JURY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 36} In his second assignment of error, Combs asserts that there was "no credible evidence" that he touched Sonia in any way, let alone in a manner that would constitute "sexual conduct." He argues that, even if the jury believed that he touched Sonia, there was "absolutely no evidence" to prove that this touching "was on the erogenous zone as that term has been defined." Combs argues that Sonia testified that what Combs allegedly touched was a blanket, "and not her erogenous zone," and that there was no evidence that any touching was for purposes of sexual gratification.

{¶ 37} In his third assignment of error, Combs asserts that there were "a number of problems with the credibility or believability of the evidence" presented by the State. He directs our attention to Kristy's testimony that she was home for 40 minutes before Jenna and Sonia arrived at her home around 3:00 a.m., and he asserts that this window of time did not allow sufficient time for all the things that supposedly happened: all his trips to the bathroom, getting into a twin bed between two girls, travel time, the gathering of Sonia's belongings, the texting between Kristy and Jenna, and "all of the other events that are alleged to have occurred." According to Combs, this alleged timeframe did not "make sense" and cast reasonable doubt on the allegations set forth at trial.

{¶ 38} Combs also notes Kristy's testimony that Jenna slapped Combs upon her

return to the couple's bedroom to awaken him, and he argues that it was implausible that he was "asleep so deeply that he had to be smacked to be awoken by [Jenna]" if only 40 minutes had elapsed, as alleged. Combs asserts that Kristy's testimony that he was asleep in bed therefore undercut the testimony that he had been "roaming throughout the house, constantly using the bathroom and going in and out of his daughter's bedroom." Further, Combs notes Kristy's testimony that he was in bed when she left the home and upon her return, and he asserts that this evidence, "coupled with Jenna's shock and his shock and denial relating to the allegations," cast reasonable doubt on the allegations.

{¶ 39} Combs points to conflicting evidence about which side of the bed Sonia was sleeping on and observes that, if Sonia were against the wall, then the version of events set forth by Sonia could not have been true. Combs also asserts that Sonia's testimony about the number of times he came into the room was inconsistent and not credible. He directs our attention to Emily's testimony that Combs "never re-entered her room after he had come in to say goodnight and bring them a blanket," and that she "was awake until [Sonia] got up and left her house."

{¶ 40} Although Combs moved for a Crim.R. 29 judgment of acquittal at the close of the State's case, the State points out that he did not renew this motion at the close of all the evidence. "It is generally accepted in Ohio that if counsel fails to make and renew a Crim.R. 29 motion during a jury trial, the issue of sufficiency is waived on appeal." *State v. Hartings*, 2d Dist. Montgomery No. 27471, 2018-Ohio-2035, ¶ 19, citing *State v. Beesler*, 11th Dist. Ashtabula No. 2002-A-0001, 2003-Ohio-2815, ¶ 23. However, even if Combs had renewed his Crim.R. 29 motion, we conclude that his argument that his conviction for GSI was based upon insufficient evidence lacks merit.

{¶ 41} The following is well-settled:

"A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt." (Citations omitted.) *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." (Citations omitted.) *Id.*

In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. When evaluating whether a conviction was against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio

App.3d 172, 175, 485 N.E.2d 717 (1st. Dist. 1983). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013 CA 61, 2013 CA 62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶ 14.

"Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses." *State v. Moore*, 2d Dist. Montgomery No. 26304, 2016-Ohio-5267, ¶ 8, citing *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). "However, we may determine which of several competing inferences suggested by the evidence should be preferred." *Id.* "A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances." *Id.*, citing *Martin* at 175.

*State v. Whitehead*, 2d Dist. Montgomery No. 28334, 2019-Ohio-5141, ¶ 20-22.

**{¶ 42}** We have also observed:

"Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citations omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. *Accord State v. Robinson*, 2d Dist. Montgomery No. 26441, 2015-Ohio-1167, ¶ 17; *State v. Putman-Albright*, 2d Dist.

Montgomery Nos. 26679, 2016-Ohio-319, ¶ 19. Consequently, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Citations omitted.) *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

*State v. Winbush*, 2d Dist. Clark No. 2016-CA-1, 2017-Ohio-696, ¶ 58.

**{¶ 43}** R.C. 2907.05, which proscribes GSI, states:

(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

\* \* \*

(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

**{¶ 44}** R.C. 2907.01(B) defines "sexual contact" as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."

**{¶ 45}** We initially observe that Combs misrepresents the testimony herein in arguing that he merely touched a blanket, not an erogenous zone of Sonia. Sonia testified that Combs repeatedly touched her "boob" and "vagina" in a "patting" manner over the blanket and that Combs exposed his penis to her and told her to look at it. Andrew testified that he observed Combs in his bedroom fondling himself before Andrew left Combs' home. "The existence of prurient motivations may be discerned from the

nature, type and circumstances of the defendant's contact with the victim, along with the personality of the defendant." *State v. Watkins*, 2d Dist. Greene No. 94-CA-106, 1995 WL 386892, *4 (June 30, 1995). As in *Watkins*, the evidence in this case concerning the type, nature, and circumstances of the contact manifested at the time of the offense supported a reasonable inference that Combs's purpose in touching Sonia was sexual gratification. *Id.* The jury obviously credited the testimony of Sonia and Andrew, and we defer to its assessment of credibility.

{¶ 46} Regarding Combs's manifest weight of the evidence argument in his third assignment of error, Kristy testified that she and Andrew were home "*about* 40 minutes *or so*" before Sonia came home, and we cannot conclude that such an inexact time period rendered Sonia's account of Combs's abuse and the other events that transpired within that time somehow incredible. Although Sonia's testimony was inconsistent regarding the number of times Combs entered the room, Dr. Miceli testified that young children "are not very good with numbers to begin with," and that the details children provide regarding their abuse can vary. As noted above, Sonia testified consistently that Combs entered the bedroom and repeatedly touched her breast and pubic region.

{¶ 47} Regarding the fact the Combs may have been deeply asleep when Kristy returned, suggesting that he had not left his bed since Andrew observed him there, we note that Combs was intoxicated that night according to multiple witnesses, and Detective Mason testified that Combs indicated he did not remember all of the evening due to his intoxication. Finally, the jury was free to (and did) credit Sonia's testimony over that of Emily, who testified that Combs did not return to the room after giving the girls a blanket. Mason testified that Combs himself reported that Emily had been sleeping when he

entered her room "a couple of times" to tuck her in. We cannot conclude that the jury lost its way in concluding that Combs did not simply remain in bed and abused Sonia.

{¶ 48} We conclude that a rational fact-finder could have found the essential elements of gross sexual imposition proven beyond a reasonable doubt. Having reviewed the entire record, and deferring to the jury's assessment of witness credibility, we cannot conclude that the jury lost its way in resolving conflicts in the evidence. In other words, we conclude that Combs's conviction was based on sufficient evidence and was not against the manifest weight of the evidence. Combs's second and third assignments of error are overruled.

{¶ 49} Combs's first assignment of error is as follows:

APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE OHIO AND UNITED STATES CONSTITUTION.

{¶ 50} Combs asserts that counsel committed multiple errors and that, but for those errors, the result of the trial would have been different. Combs argues that defense counsel was ineffective during Andrew's testimony by allowing inadmissible and prejudicial hearsay evidence to be presented to the jury, "despite the fact that the trial court had given a ruling that this evidence was not admissible" against him. Combs directs our attention to the exchange in Andrew's direct examination, set forth above, in which defense counsel withdrew his hearsay objection to statements Sonia made to Andrew. According to Combs, a defense counsel's withdrawal of the objection allowed Andrew to testify about statements Sonia made, which were "inadmissible hearsay." The State responds that Sonia's statements to Andrew qualified as an excited utterance, an

exception to the hearsay rule, and that ineffective assistance is not demonstrated by defense counsel's failure to object to admissible testimony.

{¶ 51} Combs next asserts that counsel was ineffective in that he did "not voir dire or even question the testimony of Dr. Miceli prior to her being permitted to speculate and pontificate about generalities relating to alleged sexual abuse in a case where she knew very few facts and had done little to no review of the actual allegations." Combs asserts that Miceli's testimony constituted improper "vouching" for the child witness (Sonia) and should have been objected to by trial counsel.

{¶ 52} Finally, Combs asserts that counsel was ineffective in failing of address Sonia's alleged mental health issues when cross-examining Sonia, in not offering an expert on the influences that these conditions might have had on her actions in this case, in not arguing this issue in closing argument "in any meaningful manner," and in not asking any questions of other relevant witnesses about this topic. Combs asserts that it was "axiomatic" that these conditions were relevant, and that counsel "missed an opportunity to explain why these allegations might have been made in the face of a complete lack of physical evidence."

{¶ 53} This Court has previously noted:

In order to succeed on an ineffective assistance claim, [a defendant] must show that his trial counsel rendered deficient performance and that counsel's deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish deficient performance, [a defendant] must prove that his trial counsel's performance fell below an objective standard of reasonable representation.

*Id.* at 688; *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989). In evaluating counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances the challenged action 'might be considered sound trial strategy.' " *Strickland* at 689, quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955).

To show prejudice, [a defendant] must establish that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland* at 687-688, 694; *Bradley* at paragraph two of the syllabus. The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel. *Strickland* at 697.

*State v. Hartman,* 2d Dist. Montgomery No. 27162, 2017-Ohio-7933, ¶ 30-31.

**{¶ 54}** Regarding Combs's argument about inadmissible hearsay, Evid.R. 801(C) provides: " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." "Hearsay is not admissible except as otherwise provided by the Constitution of the United States, by the Constitution of the State of Ohio, by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio, by these rules, or by other rules prescribed by the Supreme Court of Ohio." Evid.R. 802.

**{¶ 55}** Evid.R. 803 provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

* * *

(2) Excited Utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

{¶ 56} This Court has noted:

For a statement to be admissible as an excited utterance, four prerequisites must be satisfied: (1) the occurrence of an event startling enough to produce a nervous excitement in the declarant; (2) a statement made while still under the stress of excitement caused by the event; (3) a statement related to the startling event; and (4) the declarant's personal observation of the startling event.

State v. Abner, 2d Dist. Montgomery No. 20661, 2006-Ohio-4510, ¶ 69, citing State v. Taylor, 66 Ohio St.3d 295, 300-301, 612 N.E.2d 316 (1993).

{¶ 57} This Court has further noted:

The excited utterance exception to the hearsay rule should be applied liberally in a case involving the sexual abuse of a young child. State v. Boston, 46 Ohio St.3d 108, 118, 545 N.E.2d 1220 (1989). This is based upon the age of the child, the shocking nature of the act, and the surprising nature of the assault. Id.

The passage of time between the event and the child's out-of-court statement, while obviously a factor, is not dispositive. Even when the

statement is made after a substantial lapse of time, it may be admitted under the excited-utterance exception. [*State v. Taylor*], 66 Ohio St.3d 295, 303-304 [612 N.E.2d 316] (1993). Where a young child claims to have been the victim of a sexual assault, the test for admission of the child's statements does not focus upon the progression of the startling event or occurrence, but upon the spontaneous nature of the child's statement. *State v. Huntley*, 2d Dist. Montgomery No. 23545, 2010-Ohio-6102, ¶ 35. Children are likely to remain in a state of nervous excitement longer than would an adult, and therefore it has been held that admission of statements of a child regarding sexual assault may be proper under the excited utterance exception even when they are made after a substantial lapse of time. *Taylor* [at, 304]. The Ohio Supreme Court also held in *Taylor* that there is no per se amount of time after which a statement can no longer be considered to be an excited utterance; the central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may not be a result of reflective thought. *Id.*

*In re S.H.W.*, 2d Dist. Greene No. 2015-CA-25, 2016-Ohio-841, ¶ 22-23.

**{¶ 58}** We conclude that Sonia's statements to Andrew were admissible as an excited utterance. Having sexual contact with Combs was startling enough to produce a nervous excitement in Sonia, she remained under the stress of the event after the brief ride home with Jenna, and she related her observation of the event to Andrew shortly thereafter. An "attorney does not provide deficient representation by failing to object to admissible testimony. Moreover, no prejudice can result from an attorney's failure to

object to such testimony." *State v. Ross*, 2d Dist. Montgomery No. 19036, 2002-Ohio-6084, ¶ 21. Because the testimony was admissible, Combs has not established that prejudice resulted from defense counsel's withdrawal of his hearsay objection to Andrew's testimony or that counsel was ineffective in this regard.

{¶ 59} Regarding defense counsel's failure to object to Dr. Miceli's testimony or further inquire as to her qualifications, Miceli testified that she had been designated an expert witness in child psychology and child sexual abuse in multiple courts, having treated over 2,000 victims in the course of her career. She also provided extensive information regarding her education and experience. Defense counsel was not ineffective for choosing, for tactical or other reasons, not to disrupt the flow of trial to conduct more extensive voir dire of Dr. Miceli about her qualifications. *See State v. McMurray,* 12th Dist. Preble No. 2014-08-008, 2015-Ohio-2827, ¶ 35.

{¶ 60} Further, Evid. R. 702 provides:

A witness may testify as an expert if all of the following apply:

(A) The witness' testimony * * * relates to matters beyond the knowledge or experience possessed by lay persons * * * ;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *

{¶ 61} The Ohio Supreme Court has held that an expert witness's testimony that the behavior of an alleged victim of sexual abuse is consistent with behavior observed in

other sexually abused children is admissible under the Ohio Rules of Evidence. *In re Rooney*, 8th Dist. Cuyahoga No. 77212, 2000 WL 1513776, *4, citing *State v. Stowers*, 81 Ohio St.3d 260, 261, 690 N.E.2d 881 (1998). An expert psychologist's training and professional experience provide the expert with specialized knowledge of the kind recognized under Evid.R. 702 that the average person lacks about behavioral characteristics of minor victims of sexual abuse. *State v. Bell,* 176 Ohio App.3d 378, 2008-Ohio-2578, 891 N.E.2d 1280, ¶ 56 (2d Dist.), citing *Stowers; State v. Artz*, 2015-Ohio-5291, 54 N.E.3d 784, ¶ 57 (2d Dist.). "However, '[w]hat an expert may not do is offer a direct opinion on whether a child is telling the truth.' " *Artz*, citing *State v. Rosas,* 2d Dist. Montgomery No. 22424, 2009-Ohio-1404, ¶ 42, citing *State v. Boston,* 46 Ohio St.3d 108, 545 N.E.2d 1220 (1989), syllabus.

**{¶ 62}** Dr. Miceli did not specifically opine as to Sonia's truthfulness, having never met her, treated her, or been involved in this matter beyond her general testimony, and her testimony was admissible under Evid.R. 702. Ineffective assistance is not demonstrated in defense counsel's failure to object to her testimony.

**{¶ 63}** Finally, as noted above, Kristy testified regarding Sonia's global disability disorder, noting that she was high functioning, able to speak well, and capable of doing things for herself. Sonia's testimony confirmed this. Defense counsel may have reasonably decided as a matter of sound trial strategy not to suggest, by means of expert testimony, that Sonia's credibility was impugned by her disability. "We can only speculate as to the effect that [any] expert testimony may have had on the jury's determination, and speculation cannot establish a reasonable probability that the outcome of the trial would have been different." *State v. Combs*, 2d Dist. Montgomery

No. 22712, 2009-Ohio-1943, ¶ 16, citing *State v. Madrigal* 87 Ohio St.3d 378, 390-392, 721 N.E.2d 52 (2000);  s*ee also State v. Berila*, 9th Dist. Medina No. 19CA7000-M, 2020-Ohio-3523, ¶ 38;  *State v. Hanford*, 9th Dist. Summit, No. 29204, 2019-Ohio-2987, ¶ 37 (when the trial record is silent regarding the substance of a potential expert's testimony, establishing prejudice under *Strickland* requires proof outside of the record, and the claim is therefore not appropriately considered on direct appeal.)   "Furthermore, the supreme court has concluded that counsel's failure to call an expert and his decision to rely instead upon cross-examination does not constitute ineffective assistance of counsel."  (Citation omitted.). *Combs* at ¶ 16.  For the foregoing reasons, we conclude that ineffective assistance of counsel is not demonstrated, and Combs's first assignment of error is overruled.

{¶ 64} Having overruled Combs's assignments of error, the judgment of the trial court is affirmed.

. . . . . . . . . . .

FROELICH, J. and WELBAUM, J., concur.


Copies sent to:

Mathias H. Heck, Jr.
Lisa M. Light
Jay A. Adams
Hon. Timothy N. O'Connell