**[Cite as *State v. Ellis*, 2022-Ohio-962.]**

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

STATE OF OHIO                          :
                                       :
    Plaintiff-Appellee          :   Appellate Case No. 29185
                                       :
v.                                     :   Trial Court Case No. 2020-CR-4041
                                       :
DAMON ELLIS                            :   (Criminal Appeal from
                                       :   Common Pleas Court)
    Defendant-Appellant         :
                                       :

. . . . . . . . . . .

O P I N I O N

Rendered on the 25th day of March, 2022.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by LISA M. LIGHT, Atty. Reg. No. 0097348, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

GREGORY A. COHEN, Atty. Reg. No. 0061854, 114 East 8th Street, Cincinnati, Ohio 45202
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Following a jury trial, Damon Ellis was found guilty of two counts of kidnapping and one count of endangering children. The court merged the kidnapping counts prior to sentencing. The court sentenced Ellis to an indefinite term of 8 to 12 years for kidnapping and to 36 months for endangering children, to be served concurrently. The court also required Ellis to register annually with the Violent Offender Registration database upon release from prison for a period of 10 years. We will affirm the judgment of the trial court.

{¶ 2} Ellis was indicted on December 31, 2020, on the following counts: kidnapping (terrorize/physical harm)(safe release) in violation of R.C. 2905.01(A)(3), a felony of the second degree (Count 1); kidnapping (substantial risk serious physical harm)(restrain)(safe release), in violation of R.C. 2905.01(B)(2) (Count 2); abduction in violation of R.C. 2905.02(A)(2), a felony of the third degree (Count 3); and endangering children (corporal punishment) in violation of R.C. 2919.22(B)(3), a felony of the third degree (Count 4). He pled not guilty. Ellis was tried in June 2021 and was found guilty of both counts of kidnapping and of endangering children; the jury found him not guilty of abduction. Ellis was sentenced as described above.

{¶ 3} The following evidence was presented at Ellis's trial:

{¶ 4} Erik Wood, the assistant vice president of property management at Crawford Hoying, testified that the company manages apartments in Dayton, including the Water Street Flats complex, which has a video surveillance system throughout the property. Wood stated that in December 2020, he was contacted by a resident who reported a dispute in the parking lot. He identified State's Exhibit 1 as "a video of somebody putting

somebody into the trunk of a vehicle," as recorded by the property surveillance system; the video was played for the jury. According to Wood, the video also reflects a white vehicle pulling into a parking space associated with apartment 543 Water Street. Wood testified that the time and date reflected on the video were 11:11 p.m. on December 26, 2020.

{¶ 5} A.G., who was eight years old, testified that he used to live with his mother and "Biscuit," but he lived with his aunt at the time of trial. (Biscuit was a nickname for Ellis, and A.G. identified Ellis as Biscuit at trial.) A.G. stated that on December 26, 2020, after playing with his toys in the living room of his apartment, he went into the kitchen to heat up a pizza. He stated that Biscuit spoke to him, but A.G. did not listen to him because he was focused on his pizza. Biscuit then grabbed A.G. by the arm, took him to a car outside, opened the trunk, and "started to stuff [A.G.] in." A.G. testified that he did not know whose car it was. He stated that he felt "sad." A.G. stated that he repeatedly tried to avoid being put in the trunk, but he ended up locked inside. A.G. testified that it was dark and that he tried unsuccessfully to find the "pull thingy" that "lets you out the trunk." A.G. stated that he was in the trunk for five minutes before Biscuit let him out. He stated that he ran to his apartment immediately, "[f]ell down on the couch," and was crying and holding his arm because Biscuit's nails were "kind of digging" into his skin. A.G. stated that his arm hurt. He testified that the police responded to his apartment.

{¶ 6} The parties stipulated to the authenticity of a 911 call made on the night of the incident (State's Exhibit 2), and the call was played for the jury.

**{¶ 7}** Dayton Police Officer Connor Matlock testified that on December 26, 2020, he and Officer Kaer were dispatched to the Water Street Flats in response to a phone call from an anonymous person, who reported that there was a white car parked in the handicap spot in front of the apartment building and "a black male was putting a child in the trunk." Matlock stated that they entered the parking lot on foot and started walking to the apartment that was listed in the call. The officers observed a white car parked in the handicapped spot in front of that address. Matlock stated that he did not observe anyone inside the car and he heard nothing after knocking on the trunk; he opened the unlocked driver's side door and pressed the trunk release button, but found no one inside.

**{¶ 8}** Matlock testified that he approached the apartment identified in the call and knocked on the door, calling out "Dayton Police." He stated that a male voice from inside the apartment said, "no it's not," to which Matlock responded, "yes, it is. Open the door so we can talk to you." Ellis finally opened the door, and Matlock asked Ellis if that was his car outside. Ellis answered affirmatively. Matlock asked Ellis if anyone else was present in the apartment, and Ellis slammed the door shut.

**{¶ 9}** Matlock testified that after he knocked on the door again for a full minute, a female occupant answered the door; he advised her that they were responding to a report of a child forced into the trunk of a vehicle. According to Matlock, the woman said, "there's nothing going on here," and she told Matlock that her son and her boyfriend were inside. Matlock testified that the occupants did not want the police to come inside, but he could see the child inside on the couch. Matlock testified that the child was sleeping and was "covered up in blankets" so that Matlock could hardly see him. Matlock stated

that Ellis then came outside, and Matlock told him to move his car because it did not have a handicapped placard. Matlock testified that Ellis walked to the car, yelling at the officers "the whole time," got into the car, and "sped away" to another spot on the other side of the parking lot. Matlock and Kaer then left the scene.

{¶ 10} Matlock testified that he returned to the scene on December 28, 2020, with other officers to watch security video footage from the night of the incident. The video was again played for the jury, and Matlock testified that the snow visible in the parking lot indicated the temperature on the evening of the incident. He identified himself and Officer Kaer in the video in the parking lot.

{¶ 11} Matlock testified that the officers returned to the apartment and knocked on the door "for a couple minutes" before the female again answered; Ellis arrived later, and Matlock placed him under arrest and put him in his cruiser. On cross-examination, Matlock stated that the woman with whom he interacted in the course of the investigation was Shirmira Rhodes, A.G.'s mother.

{¶ 12} Dayton Police Detective Steven Ettinger, a special victims unit detective from Care House, was assigned to A.G.'s case on December 28, 2020. Care House is a child advocacy center employing detectives, social workers, children's services employees, and medical staff to investigate cases involving child victims. Ettinger testified that he responded to 543 Water Street, where he spoke to Rhodes and A.G. Ettinger stated that A.G. was excited to speak with him about his Christmas presents but was "more reserved and frightened" when asked about the incident Ettinger was investigating. Ettinger stated that, while at the apartment, he observed a "superficial

scratch, bruise that was about three inches long on [A.G.'s] forearm." Ettinger then made a referral to Children's Services and went to the Safety Building to interview Ellis.

{¶ 13} Ettinger stated that his interview with Ellis was audio- and video-recorded, and he identified the recording of the interview as State's Exhibit 3. Ettinger testified that he conducted the interview with Detective Alexander Dole. Ettinger identified Ellis's pre-interview form reflecting Ellis's *Miranda* rights, and the interview was played for the jury, lasting approximately 26 minutes.

{¶ 14} On cross-examination, Ettinger testified that he had not taken a photograph of the injury he observed on A.G.'s arm. He acknowledged that, in the course of the interview, Ellis stated that he had had no malice or ill-intent, and that he was trying to engage in "scared straight" tactics with A.G., which involved "yelling at young teenagers, young adults, to try to straighten them up." He acknowledged that Ellis stated that he had nothing to hide, that A.G. was in the trunk for less than a minute, and that Ellis did not return to the apartment during that time. Ettinger stated that A.G. reported being scared in the course of the incident.

{¶ 15} At the conclusion of the State's case, defense counsel moved for an acquittal. The court overruled the motion.

{¶ 16} Shirmira Rhodes testified for the defense. She stated that she had moved into the Water Street apartments in August 2020 with Ellis and A.G., and that her daughter visited on weekends from Columbus. She stated that she occasionally had to discipline A.G. She testified that other adults generally did not have permission to discipline him in ways such as "putting * * * hands on" him or "whup[ping]" him, but that she did not mind

if other adults talked to her child or asked why he was not minding his mother. She testified that, because Ellis lived with her, he had her permission to correct or discipline A.G.'s behavior, as did Rhodes's mother, her grandmother, and other family members.

{¶ 17} Rhodes testified that she, Ellis, and A.G. had returned late on the night of the incident from dropping her daughter off in Columbus; she told A.G. to go to bed, but he wasn't listening and was getting on YouTube. She testified that, when Ellis came in the house, she overheard him talking to A.G., asking why he didn't listen to his mom, and "having a good conversation," which "maybe [A.G.] * * * need[ed] to hear." She stated that Ellis also spoke to A.G. about leaving trash in the living room and threatened to put it in A.G.'s room if A.G. didn't pick it up.

{¶ 18} Rhodes stated that, when she heard Ellis speaking to A.G. on the night of the incident, she did not know what Ellis intended to do to A.G., and she would have intervened if she had known. She stated that when Ellis returned to the apartment after the incident, he "had jokingly mentioned it," and she had asked why he would do something like that, calling it childish. She stated that she was very frustrated, "especially when the police [came]." Rhodes testified that afterwards, She had talked with Ellis about it, because it was a "big thing," and Ellis had explained that he was "just * * * trying to scare him." Rhodes testified "it didn't sit too well" with her.

{¶ 19} Rhodes stated that A.G. "was just playing normal" with his toys and Ellis the day after the incident, "chilling" and "talking." Rhodes stated that A.G. "didn't act like anything was wrong with him or nothing." She also stated that Ellis had never hit or spanked A.G., but that he might have done something to scare him. For example, she

testified that if A.G. was afraid of the dark or something like that, Ellis might go in the bathroom with him "and turn the lights off and come out." Rhodes stated that A.G. was not afraid of Ellis.

{¶ 20} Rhodes stated that when the police arrived two days after the incident, they woke A.G. up and asked for Ellis; she told them Ellis was not home, and she called Ellis and told him the police were there. She stated that she did not get to see the video of the incident and that she did not observe any injuries to A.G. According to Rhodes, Ellis and A.G. "continuously played like they normally do and talk[ed] and everything" after the incident.

{¶ 21} On cross-examination, when asks how she disciplined A.G., Rhodes stated that A.G. "gets a whupping" or she takes things away from him, such as his phone, if he doesn't listen. When asked if Ellis was allowed to hit A.G., Rhodes responded, "If my son ever got too carried away he could." She stated that Ellis would sometimes put A.G. into a dark room and mention a scary "Candyman" character to frighten him, and she "would just let him do what he do. But if he take it too far, I'm like, okay, that's enough." When asked if Ellis ever did take it too far, Rhodes responded negatively, saying that this incident was the first time.

{¶ 22} Rhodes stated that she was in her bedroom when the incident happened; she heard the front door close, but it "opened right back." When she looked into the living room, A.G. was there, so she was not concerned. She later told the detectives that she was "mad" about what had happened because Ellis "crossed a line."

{¶ 23} Rhodes testified that she moved out of the Water Street apartments

because her lease was "terminated * * * because of this case," but she still lived with Ellis.

{¶ 24} On redirect examination, Rhodes stated that, "people that you live with, they're family," and their ability to discipline her child was different from what a stranger could do. She stated that A.G. once shot her mother in the eye with a Nerf gun, and that her mother "whupped him."

{¶ 25} Defense counsel did not renew the motion for acquittal at the end of trial.

{¶ 26} Defense counsel submitted the following proposed jury instruction:

**Proposed Jury Instruction I – CR 519.25 Reasonable Parental Discipline**

1. REASONABLE PARENTAL DISCIPLINE. The defendant claims that he was engaged in reasonable and proper discipline of the child. The law permits a person acting in loco parentis to use reasonable and proper discipline measures to discipline a child. If you find by the greater weight of the evidence that at the time in question the defendant was engaged in reasonable and proper discipline of a child under the age of eighteen, then you must find the defendant not guilty of domestic violence.

2. Proper and reasonable parental discipline can be an affirmative defense to a charge of domestic violence. A parent may use corporal punishment as a method of discipline without violating R.C. 2919.25 as long as the discipline is proper and reasonable under the circumstances. "Proper" and "reasonable" have been respectively defined as "suitable or appropriate" and "not extreme or excessive."

* * *

3.   IN LOCO PARENTIS.   "In loco parentis" means standing in the place of a parent and assuming parental duties and responsibilities. * * *

**{¶ 27}**   The State opposed the proposed instructions, stating:

The Defendant has proposed three jury instructions.   The State objects to instructions one and two.   Specifically, the Defendant cites "domestic violence" in his jury instructions.   The Defendant is not charged with domestic violence.   The Defendant is charged with two counts of Kidnapping, one count of Abduction, and one count of Child Endangering.

As such, instructing the jury on "domestic violence" by word, statute, or otherwise would be wholly inapplicable to this case.

Wherefore, the State OBJECTS to the Court's incorporation of this language into any jury instruction.

**{¶ 28}** At the conclusion of the evidence, the following exchange occurred while the court and the parties discussed the jury instructions:

THE COURT: * * * Let's go down, then, to this is the proposed jury instruction filed by the defendant under reasonable parental discipline.   I've got it highlighted.   I said I would wait until after I heard the Defense's case in order to make a ruling on that.   We're to that point now.   I'd like to hear if there's any further arguments on this before I make a ruling. [Defense Counsel], it's your proposal, so I'll start with you.   If you have anything additional.

[DEFENSE COUNSEL]:   Judge, I think that the testimony from our

witness is that he was in that position of in loco parentis. I think that she did say that he was permitted to live in the house with them, to tell him what to do, tell him to do things. I think that's part of her testimony. And so I think it's an appropriate jury instruction. Whether or not the jury thinks it was reasonable what he did, or not reasonable, it's a question of fact for them to determine.

THE COURT: Any response from the State?

[THE PROSECUTOR]: This section of child endangerment does not require loco parentis; it's any person recklessly administering corporal punishment. So I think it's adding in things that don't need to be argued as far as adding in the loco parentis part of it.

[DEFENSE COUNSEL]: The State made a very clear statement that - - and it's true, Judge, You overruled my objection that he is definitely not a parent. But I think in loco parentis means a person who's standing in the place of the parent, assuming parental responsibility. I think it's appropriate.

THE COURT: I listened very carefully to the testimony, and I think if you were going to establish this, it had to be established by the witnesses that you have called. The mother testified that she did not allow others to discipline the children, but her definition was to talk to them. There was some indication that grandma spanked one of the kids.

But I didn't hear any testimony that talked about them sharing

parental responsibilities. I didn't hear anything about the Defendant helping in any way with parental responsibilities. Just the fact that he lived there, I don't think is enough. There was no testimony about him cooking for the kid, taking the kid to school, doing homework, anything like that.

And then when it comes to the discipline aspect of it, the mother sort of indicated, yeah, he was allowed to do it, but what was telling to me was that she said he crossed the line. And she was mad. So when she said he crossed the line, that sort of indicated that it was beyond her expectation of granting some sort of privilege for someone to discipline her children.

I just don't think it was established in the case for me to grant this instruction. And I was looking for ways to give this instruction, and I did not find anything from the testimony that would do that. For that reason and also the State's argument on the record, I'm not going to allow those instructions.

[DEFENSE COUNSEL]: Your Honor, if I may just put two more things on the record.

THE COURT: Yes.

[DEFENSE COUNSEL]: So the mother did testify that even the next day, that he was cooking at the house for the family. She testified to that. Secondly, she said that she allowed him to discipline and if it was an extreme circumstance, he could have even spanked the child. She did say that was well. I don't believe the statute or the language of this requires

that we prove that he paid child support, that he provided some - - she talked about he engaged the child, how they played together. They were part of the same household.

So I object to the Court not allowing us to argue this essentially affirmative defense in this case, and respectfully, Your Honor, I think it's errant to not allow this particular definition and affirmative defense we presented on the case.

THE COURT: We can talk about it some more here. But I just don't think that it was established * * * from the evidence, the affirmative defense. If the State has no objection to giving it, I will. But that's what I heard, and I appreciate your comments * * * on it, but I just don't think it was there.

[THE PROSECUTOR]: The State continues to object for the grounds we asserted in here and on the record and which we addressed in writing.

THE COURT: * * * And I have considered all of that: your argument in writing, your argument now, and what I heard. And taking into account also * * * I know that - - and I accept your arguments with respect to the Court, and I just cannot find that it's proper for me to give this instruction, so I'm not going to allow it.

{¶ 29} The court instructed the jury as follows on endangering children:

The Defendant claims that he was engaged in reasonable and proper

discipline of the child. The law permits a person acting in loco parentis to use reasonable and proper measures to discipline a child. If you find by the greater weight of the evidence, that at the time in question, the Defendant was engaged in reasonable and proper discipline of the child under the age of 18, then you must find the Defendant not guilty of endangering children.

In loco parentis means standing in place of a parent and assuming parental duties and responsibilities.

* * *

Proper means suitable or appropriate.

Reasonable means not extreme or excessive.

{¶ 30} Ellis's presentence investigation report reflected that he had served a prison sentence for drug-related offenses in Montgomery and Greene Counties in 1996. He had also been convicted of drug trafficking in Greene County in 1998 and was placed on community control sanctions. Ellis served another prison term for forgery in Franklin County in 2007, after having his probation revoked. He was convicted of possession of drugs and obstructing official business in Greene County in 2012 and was again given probation. His probation was revoked when he engaged in drug trafficking in Montgomery County in 2014. He was released from that term in 2015. Including his convictions in this case, he had been convicted of over 10 felonies.

{¶ 31} As discussed above, the trial court imposed an aggregate sentence of 8 to 12 years.

{¶ 32} Ellis appeals, raising five assignments of error. We will consider his first two assignments of error together. They are:

THE JURY ERRED TO THE PREJUDICE OF THE DEFENDANT-APPELLANT BY FINDING HIM GUILTY OF KIDNAPPING UNDER THE OHIO REV. CODE § 2905.01(A)(3), AND KIDNAPPING UNDER THE OHIO REV. CODE § 2905.01(B)(2) AS THOSE FINDINGS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE,

THE JURY ERRED TO THE PREJUDICE OF THE DEFENDANT-APPELLANT BY FINDING HIM GUILTY [OF] KIDNAPPING UNDER THE REV. CODE § 2905.01(A)(3), AND KIDNAPPING UNDER THE OHIO REV. CODE § 2905.01(B)(2), AS THOSE FINDINGS WERE CONTRARY TO LAW.

{¶ 33} In his first assignment of error, Ellis asserts that he had permission to discipline A.G., and that his "brief action" of taking him out of the apartment and placing him in the trunk of the car to scare him did not constitute the crime of kidnapping. He asserts that the "was acting within his scope of authority to discipline" A.G., and that the issue should be whether or not his conduct constituted child endangerment. He asserts that he should be viewed as having acted in loco parentis -- and not as having kidnapped the child – just as a grandparent, babysitter, or sibling who "drags a disrespectful child from the playroom" to a bedroom or "forces a child to sit in a darkened room to think about his or her conduct" would be viewed as in loco parentis. He asserts that his conviction was not supported by sufficient evidence.

{¶ 34} In his second assignment of error, Ellis asserts that his conviction was against the manifest weight of the evidence, and that the jury, in disregarding the testimony of A.G.'s mother, clearly lost its way and created a manifest miscarriage of justice. He asserts that, in light of Rhodes's testimony that Ellis lived in her household and had permission to discipline the child, a reasonable jury could not have concluded that this event was a kidnapping rather than a "boneheaded effort" to discipline a disrespectful child.

{¶ 35} The State responds that, because Ellis did not renew his Crim.R. 29 motion for acquittal at the close of all the evidence, he has failed to preserve his insufficiency argument for appeal. The State cites *State v. Combs*, 2d Dist. Montgomery No. 28559, 2020-Ohio-4084, in support of this argument. " 'It is generally accepted in Ohio that if counsel fails to make and renew a Crim.R. 29 motion during a jury trial, the issue of sufficiency is waived on appeal.' " *Id.* at ¶ 40,

{¶ 36} The State further asserts that the evidence was sufficient and the jury did not lose its way in finding Ellis guilty of both counts of kidnapping, while pointing out that he was only convicted of one kidnapping offense. The State argues that Ettinger's testimony that he observed a three-inch scratch and bruise on A.G.'s forearm, and A.G.'s testimony that his arm hurt where Ellis's fingernails had dug into his skin, established that actual physical harm had occurred. Further, the State contends that Ellis's slamming the trunk door on top of A.G. and trying to close it while A.G. was attempting to escape created a substantial risk of serious physical harm to A.G. The State notes that it "had no duty to prove any distance or duration of time that the restraint occurred. The State

argues that A.G. was forced out of his apartment and into the trunk of a car unwillingly, while struggling to climb out. The State further asserts that Rhodes did not give Ellis the permission or authority to do this, but even if she had, her consent would not negate the fact that Ellis's conduct constituted the crime of kidnapping under both R.C. 2905.01(A)(3) and R.C. 2905.01(B)(2).

**{¶ 37}** As this Court has noted:

A sufficiency of the evidence argument asserts that the State has not presented adequate evidence concerning one or more elements of an offense, and, thus, the verdict is erroneous as a matter of law. *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). The applicable test is set forth in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), as follows:

An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

(Citation omitted.) *Id.* at paragraph two of the syllabus.

In contrast, an appellate court, when deciding a manifest weight challenge, reviews "the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence the jury clearly lost its way and created such a miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in exceptional cases in which the evidence weighs heavily against a conviction." *State v. Radford*, 2d Dist. Clark No. 2016-CA-80, 2017-Ohio-8189, ¶ 15, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

Finally, "while sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." *Id.* at ¶ 16, quoting *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. Accordingly, the conclusion that a conviction is supported by the weight of the evidence "will also be dispositive of the issue of sufficiency." *Id.*, quoting *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

*State v. Stansel*, 2d Dist. Clark No. 2018-CA-76, 2019-Ohio- 1906, ¶ 9-11.

{¶ 38} R.C. 2905.01 proscribes kidnapping and provides:

(A) No person, by force, threat, or deception, or, in the case of a victim under

the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

* * *

(3) To terrorize, or to inflict serious physical harm on the victim or another;

* * *

(B) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall knowingly do any of the following, under circumstances that create a substantial risk of serious physical harm to the victim or, in the case of a minor victim, under circumstances that either create a substantial risk of serious physical harm to the victim or cause physical harm to the victim:

* * *

(2) Restrain another of the other person's liberty.

**{¶ 39}** " 'Substantial risk' means a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist."   R.C. 2901.01(8).

**{¶ 40}** R.C. 2901.01(5) provides:

(5) "Serious physical harm to persons" means any of the following:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

{¶ 41} Based on the record before us, Ellis's kidnapping conviction was supported by the manifest weight of the evidence (which is also dispositive of the issue of sufficiency). While Ellis asserts that he acted with Rhodes's permission, his argument is belied by her testimony that she was angry and that Ellis "crossed a line" in disciplining A.G. We are unpersuaded that Ellis's conduct was akin to someone removing a disrespectful child from a playroom to another room within a home for a "time out," as Ellis suggests. Ellis forcefully and aggressively removed A.G. from his home late on a cold December night and violently stuffed him into the dark trunk of his car, repeatedly slamming the lid, until A.G., who is afraid of the dark, was locked inside. Ellis acknowledged to Detective Ettinger that he intended to use "scared straight" tactics with A.G., and Ettinger testified that A.G., who was only eight years old at the time of trial, told him that he had been scared during the incident. A.G. testified that when let out of the trunk, he was cold, ran into the apartment, and cried on the couch; his arm hurt from Ellis's fingernails digging into his skin. Ettinger testified that he had observed scratches and bruises on A.G.'s forearm. The jury viewed the video of the incident, and it clearly

credited the testimony of the State's witnesses, as well as Rhodes's testimony that Ellis crossed the line; we must defer to the jury's assessment of credibility. Based upon the foregoing, we cannot conclude that the jury lost its way in convicting Ellis of kidnapping, as the weight of the evidence supported the jury's conclusion finding him guilty.

{¶ 42} The first and second assignments of error are overruled.

{¶ 43} Ellis's third and fourth assignments of error are worded identically as follows:

THE JURY ERRED TO THE PREJUDICE OF THE DEFENDANT-APPELLANT BY FINDING HIM GUILTY OF ENDANGERING CHILDREN UNDER THE OHIO REV. CODE § 2919.22(B)(3), AS THOSE FINDINGS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶ 44} Under these assignments of error, Ellis argues that the State failed to meet its burden of proving that he was guilty of endangering children, that his conviction for endangering was against the manifest weight of the evidence, and that he was entitled to a new trial.

{¶ 45} Specifically, in his third assignment of error, Ellis asserts that his conviction of endangering children was supported by insufficient evidence because there was "no finding of serious physical harm." He asserts that, although Ettinger testified that he had observed an injury to A.G.'s forearm, he "did not take a picture," and it is "hard to imagine in this day and age that a police officer with a cell phone would not have taken a picture of serious physical injury."

{¶ 46} In his fourth assignment of error, Ellis asserts that, while the jury might have

reasonably found him guilty him of misdemeanor endangering children, there was no evidence that he committed the felony version of the offense because of the absence of evidence of serious physical harm.

{¶ 47} The State responds that it did not have to prove that A.G. sustained serious physical harm, and that it "provided sufficient evidence that there was a substantial risk of serious physical harm" to A.G.   The State notes that Ellis cites no case law or evidence showing why a jury should have found him guilty of misdemeanor child endangering over felony child endangering; it contends that the jury was correctly instructed on felony child endangering and returned a guilty verdict which was supported by the evidence it heard.

{¶ 48} R.C. 2919.22 proscribes endangering children and provides in relevant part:

(B) No person shall do any of the following to a child under eighteen years

of age or a mentally or physically handicapped child under twenty-one years

of age:

* * *

(3) Administer corporal punishment or other physical disciplinary measure,

or physically restrain the child in a cruel manner or for a prolonged period,

which punishment, discipline, or restraint is excessive under the

circumstances and creates a substantial risk of serious physical harm to the

child * * *.

{¶ 49} As with Ellis's kidnapping conviction, his endangering children conviction was not against the manifest weight of the evidence and was supported by sufficient evidence.   By his own admission, Ellis intended to use "scared straight" tactics in

disciplining A.G. The jury could have reasonably concluded that Ellis's restraint of A.G. was violent, cruel, and excessive, in that Ellis knew that A.G. was afraid of the dark and put him in the trunk on a cold, dark night. We agree with the State that it was not required to establish that A.G. was restrained for a prolonged period or suffered serious physical harm; a plain reading of the statute refutes these assertions. The State only needed to prove that Ellis's conduct created a substantial risk of serious physical harm to A.G. Ellis dragged A.G. from his home, digging his nails into the child's arm along the way, and stuffed him into the trunk of his car after repeatedly slamming the lid of the trunk as A.G. fought to escape; the jury reasonably concluded that, in doing so, Ellis created a substantial risk of serious physical harm to A.G. In other words, the jury did not lose its way in finding Ellis guilty of endangering children. Ellis's third and fourth assignments of error are overruled.

{¶ 50} Ellis's fifth assignment of error is as follows:

THE TRIAL COURT ABUSED ITS DISCRETION BY REFUSING TO [GIVE] A JURY INSTRUCTION WHEN THE EVIDENCE AT TRIAL SUPPORTED THE INSTRUCTION.

{¶ 51} Ellis asserts that there was sufficient evidence at trial to support his request for an in loco parentis instruction and that the trial court should have given the requested instruction. The State responds that Ellis's argument is misplaced and without merit because the trial court did instruct the jury on in loco parentis.

{¶ 52} As noted above, the trial court instructed the jury on reasonable parental discipline and in loco parentis. Accordingly, Ellis's fifth assignment of error lacks merit,

and it is overruled.

{¶ 53} Having overruled Ellis's assigned errors, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

WELBAUM, J. and EPLEY, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Lisa M. Light
Gregory A. Cohen
Hon. Dennis J. Adkins